**UNITED STATES of America,**

v.

**GREATER BLOUSE, SKIRT & NECK-WEAR CONTRACTORS ASSOCIA-TION, Inc., et al., Defendants.**

United States District Court
S. D. New York.
April 13, 1964.

484

John J. Galgay, Dept. of Justice, Antitrust Div., New York City, David H. Harris, Irving Kagan, Richard B. O'Donnell, New York City, of counsel, for the United States.

Wilbur Daniels, New York City, for defendants Greater Blouse, Skirt & Neckwear Contractors Ass'n, Inc., James Clemenza and I. Lloyd Cabin.

Amen, Weisman & Butler, New York City, Herman L. Weisman, New York City, of counsel, for defendants National Ass'n of Blouse Mfrs., Inc., and Abraham Rosenthal.

Lord, Day & Lord, New York City, Herbert Brownell, John W. Castles, 3d, Wendell Davis, Jr., Robert B. Haynes, New York City, Gene R. McHam, of counsel, for defendant Slate Belt Apparel Contractors' Ass'n, Inc.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Simon H. Rifkind, Jay H. Topkis, New York City, of counsel, for defendants Local 25, International Ladies' Garment Workers Union, and Charles Kreindler.

Brower, Brill & Gangel, New York City, Joseph E. Brill, New York City, of counsel, for defendant Harry Strasser.

EDWARD WEINFELD, District Judge.

This is a motion by the Attorney General pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure[1] for leave to file a dismissal of the above indictment as to all defendants. The indictment was returned by a grand jury in March 1959, charging violations of sections 1 and 2 of the Sherman Act[2] in the production of ladies' blouses in a four-state area, principally in New York and Pennsylvania. The defendants include a manufacturer's association, referred to hereafter as "National"; two contractors' associations, referred to hereafter as "Slate Belt" and "Greater Blouse"; a local labor union, referred to hereafter as "Local 25"; and five individuals. All pleaded not guilty. The substance of the charge is that they conspired to (1) fix the prices to be paid by members of National, the manufacturer's association, to the members of the two contractors' associations; (2) allocate blouse contracting work of National's members among the members of Slate Belt and Greater Blouse, the contractors' associations; (3) require members of National to give their blouse contracting work exclusively to members of the two contractors' associations; (4) establish a policing and enforcing system to carry out the foregoing; and (5) require independent manufacturers of ladies' blouses to join National or to conform to the terms of the alleged conspiracy.

The motion to dismiss the indictment is opposed only by one defendant, Slate Belt, whose members conduct their contracting functions in factories located in Pennsylvania. All other defendants acquiesce in the motion.

The essence of Slate Belt's opposition is that since the return of the indictment, now a matter of over five years, certain restrictive practices charged therein, which it alleges were imposed upon its members by the other defendant associations and Local 25, have been eliminated or not enforced—that an era of peace and prosperity has existed—in short, that the industry has been stabilized and free competition prevails, all the result, so Slate Belt claims, of the pendency of the indictment. Slate Belt urges that as a consequence the blouse

---

1. "The Attorney General or the United States attorney may by leave of court file a dismissal of an indictment, information or complaint and the prosecution shall thereupon terminate. Such a dismissal may not be filed during the trial without the consent of the defendant."

2. 26 Stat. 209 (1890), as amended, 15 U.S.C. §§ 1, 2 (1958).

industry has burgeoned in Pennsylvania and its members have enjoyed great prosperity; however, it acknowledges that the flow of business there has been at the expense of the New York contractors who are members of Greater Blouse. Accordingly, its position is that if the prosecution is abandoned at this time, there is risk of the reimposition of the restrictions and controls charged in the indictment by what it terms the New York group, which would result, to use its language, in "the severest consequences to the blouse industry in Pennsylvania." It also adds that its members will be exposed to reprisals by other defendants, particularly so since they allegedly cooperated with Government officials. The other defendants vigorously deny these assertions made by their codefendant, and one emphasizes they are contrary to Slate Belt's position at an early stage of the indictment.

The application to obtain leave of Court for the entry of a nolle prosequi is made on behalf of the Attorney General by the Assistant in charge of the Antitrust Division of the Department of Justice. He states that upon a re-evaluation of the case, recently completed, it is the Government's position that the evidence now available is insufficient to establish the conspiracy as alleged in the indictment beyond a reasonable doubt, and consequently in the interests of justice the indictment should be dismissed.[3] The application is supported by the attorney in the Antitrust Division who, since June 1962, has been in charge of trial preparation. Previously, since 1960, he had served on the trial staff which had conducted the investigation which led to the indictment, and thereafter, and until he was placed in charge of the matter, was a member of the staff engaged in the trial preparation. This attorney, who made the basic

re-evaluation of the evidence, submitted two affidavits. In the first he opined as to the insufficiency of the presently available evidence to sustain the charges beyond a reasonable doubt; in the second affidavit, submitted after argument of this motion, he expressed the view that the evidence is not even sufficient to make out a prima facie case against the Union, as alleged in paragraph 34 of the indictment.[4] The motion is also supported by an affidavit of the Chief Attorney of the New York office of the Antitrust Division, who concurs with the view of the trial attorney in charge of the matter, who is under his supervision. The Chief Attorney explains the circumstances which led to the present motion: The Assistant Attorney General in charge of the Antitrust Division of the Department of Justice had ordered a re-evaluation of all cases which had been pending for a substantial period, and it was as a result of this re-assessment that the trial attorney in June 1963 pointed out certain weaknesses with respect to the proof against Local 25. Thereafter the matter was reviewed by the Assistant Attorney General and other superiors in the Antitrust Division in Washington and they concurred in the judgment of the local trial attorney and the local chief attorney. The officials were then confronted with the problem of " * * * whether to apply for nolle prosse against the Union and proceed to trial against the remaining defendants, or to try the case against all defendants, confident that we would not prevail against the defendant Union at trial"; that after extended consideration it was decided to apply for a nolle prosequi against all defendants. This decision was based on two factors. First, that prosecution against the remaining defendants would involve a completely different theory (United States v. Women's Sportswear Mfgrs. Ass'n, 336 U.S.

---

3. Upon initial presentation of the application, the Court indicated that while the Rule did not require supporting affidavits, these would be required, consistent with the ·Court's policy as applied in other cases.

4. This paragraph sets forth the means and methods whereby it is charged the alleged conspiracy was effectuated.

460, 69 S.Ct. 714, 93 L.Ed. 805 (1949)) than that presented to the grand jury (Allen Bradley Co. v. Local No. 3 etc., 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945)); and second, the Department of Justice officials felt it would be inappropriate, if not unfair, to nolle prosse against the Union and to continue the prosecution against, among others, Slate Belt, somewhat of a complainant in the matter.

■ The Attorney General of the United States, as its chief legal officer, has the authority and the duty to exercise control and supervision of all criminal proceedings and civil suits to which the United States is a party.[5] He is specifically charged with the enforcement of the antitrust laws both by way of criminal prosecutions and civil sanctions.[6] Accordingly, his judgment, or more correctly, that of the members of his staff who are in immediate charge of the matter, that a prosecution should be abandoned on the ground that the available evidence is insufficient to make out a prima facie case against one defendant, and requires a shift in theory from that presented to the grand jury as to the other defendants as to whom there is a further question of the sufficiency of the evidence to establish the charges beyond a reasonable doubt, is entitled to great weight. His recommendation gains added force, aided as it is by the presumption that he is acting in good faith and in the proper discharge of his duties,[7] but it is not conclusive upon the Court; otherwise there would be no purpose to Rule 48(a), which requires leave

of Court to enter the dismissal. However, to overcome the force of his recommendation, it must clearly and convincingly appear that the public interest requires its refusal.

The Rule sets forth no criteria to guide the Court in the exercise of its discretion, nor does it require that the prosecutor state his reasons.[8] There is scant historical material as to its purpose other than a statement by the Advisory Committee that the Rule conforms to the procedure then prevalent in many states.[9] Previous to its enactment, the Attorney General was free under the common law rule to enter a nolle prosequi of an indictment without Court approval.[10] However, occasionally applications were made to obtain the Court's sanction to give the weight of its authority to a prosecutor's abandonment of an indictment, in such rare instances the Court deemed that its discretion had been invoked and the reasons for granting or withholding approval varied.[11]

■ This Court is of the view, expressed at the time of argument, that the Rule contemplates public exposure of the reasons for the abandonment of an indictment, information or complaint in order to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors. Accordingly, to gain the Court's favorable discretion, it should be satisfied that the reasons advanced for the proposed dismissal are substantial and the real grounds upon which the application is based. Such applications should be granted where it appears (1) that the Government is

5. Act of June 30, 1906, 34 Stat. 816–17 (1906), 5 U.S.C. § 310 (1958); 28 U.S.C. § 507 (1958); Parker v. Kennedy, 212 F.Supp. 594 (S.D.N.Y.1963).

6. 26 Stat. 209–10 (1890), as amended, 15 U.S.C. § 4 (1958).

7. United States v. Chemical Foundation, Inc., 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131 (1926).

8. The Rule, when first proposed by the Advisory Committee, gave the Attorney General or the United States Attorney a right to dismiss without leave of Court, but required a statement of the reasons for the dismissal. The Supreme Court, however, revised the proposed Rule to its present form. See VI NYU School of Law Institute Proceedings 170–71 (1946).

9. Id. at 85.

10. Confiscation Cases, 74 U.S. (7 Wall.) 454, 457, 19 L.Ed. 196 (1868).

11. Compare United States v. Krakowitz, 52 F.Supp. 774 (S.D.Ohio 1943) with United States v. Corrie, 25 Fed.Cas. 658 (No. 14,869) (C.C.D.S.C.1860).

without sufficient evidence to warrant prosecution and sustain a conviction, and (2) the dismissal is not for the purpose of subjecting a defendant to harassment by the commencement of another prosecution at a different time or at a place deemed more favorable to the prosecution.[12]

No claim is made here that the dismissal is sought for the purpose of renewed prosecution against defendants. The sole challenge is to the Government's position that the current available evidence is insufficient to warrant a trial. In contesting the Government's position, the opposing defendant relies upon the indictment itself and the fact that at times the Government has indicated it was ready to proceed to trial. Slate Belt, in support of its opposition, has submitted affidavits by three former attorneys of the Department of Justice who, in greater or lesser degree, participated in the investigation and presentation of the charges to the grand jury, and who, until their resignations, were engaged in the trial preparation. These affiants, in substance, set forth their view that at the time of the filing of the indictment the evidence was sufficient to support the charges. Two of the affiants further state that Slate Belt cooperated during the investigation and at times had been assured by them that the Department of Justice intended to proceed to trial.

Originally, the Department of Justice objected to consideration of the affidavits of its former employees on the ground of irrelevancy to the issue presented by this motion. The Court, however, *sua sponte,* questioned the propriety of these affidavits and their submission to the Court,[13] since the matters referred to therein were obviously based upon information and knowledge derived by each attorney during his service as an attorney of the Department of Justice or during the course of appearances before the grand jury in this very matter.[14] Thereupon the Department took the further position that the affidavits should be excluded as in violation of the attorney-client privilege, it not having been waived.

The submission of these affidavits by former attorneys of the Department of Justice, used in opposition to the Government's motion, raises a serious and substantial question of propriety. However, it is unnecessary to decide the question, since the issue presented by this motion is the current status of the matter, not its status upon the return of the indictment, and on this issue the affidavits are without relevancy.[15] These affiants resigned from

12. Woodring v. United States, 311 F.2d 417 (8th Cir.), cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963); Parr v. United States, 225 F. 2d 329 (5th Cir. 1955) (Cameron, J., dissenting), aff'd on other grounds, 351 U.S. 513, 76 S.Ct. 912, 100 L.Ed. 1377 (1956); United States v. Doe, 101 F. Supp. 609 (D.Conn.1951). See also United States v. Shanahan, 168 F.Supp. 225 (S.D.Ind.1958), where the Court, satisfied that the Government would be prejudiced in another and far more reaching criminal action if forced to continue, granted leave to nolle prosse.

13. Thereafter, affidavits were submitted which purported to explain the circumstances under which the affiants executed their respective affidavits and to justify their submission. Among other matters, it appears that one of the affiants consulted a member of the Committee on Professional Ethics of the Association of the Bar of the City of New York, who expressed the view there was no impropriety in the submission of an affidavit as to the matters now contained therein. Subsequently it developed that the Committee member's opinion was not shared by the Chairman of the Committee. The Court, in response to an inquiry from the Committee Chairman, indicated that while no request was made for a brief amicus curiae, it would receive any brief which the Committee desired to submit. However, no brief has been submitted. The Court files herewith all the correspondence received in this matter and it is made part of the record.

14. See Fed.R.Crim.P. 6(e).

15. Cf. United States v. McWilliams, 163 F.2d 695 (Edgerton, J., dissenting). (D. C.Cir. 1947)

the Department of Justice and returned to private practice approximately four (January 1960), three (January 1961) and two (February 1962) years, respectively, before the present motion was made and none has had any connection with the matter within the Department since his resignation. Accordingly, the opinion of the three former attorneys that at the time of the return of the indictment, and even thereafter, to the date of their resignations, the available evidence was sufficient to support a prima facie case is irrelevant insofar as this motion is concerned.

As to the indictment itself, it is true that upon its return by the grand jury it was sufficient prima facie to require a trial upon the merits.[16] The Government does not now question, nor has it ever questioned, the validity of the indictment or that it was properly returned. Its essential position is that at this time, five years after it was filed, those who bear the burden of persuasion upon a trial are of the view that the essential proof necessary to sustain the charge is lacking. The evidence required for the return of a true bill by a grand jury and that required to support the charges upon a trial are two entirely different matters. The grand jury may act upon hearsay, incompetent or even inadequate evidence.[17] A trial upon the merits of the charges contained in such an indictment demands proof by competent and legal evidence—"strict observance of all the rules designed to bring about a fair verdict."[18]

The contention that the Government has at times stated it was ready to proceed should be set in its proper perspective as to time and circumstances. The case had been assigned to this Court for all purposes pursuant to the Local Rules.[19] The Court set a schedule for matters preliminary to trial. The trial estimate was six to ten or more weeks. On two separate occasions in 1962 the Court fixed firm dates for trial, but in each instance an application was made by a defendant for a continuance. The basis of these applications, in substance, was that counsel for the various defendants were each engaged in separate negotiations with the Department of Justice with a view toward a possible disposition through a consent decree of a parallel civil suit instituted against all defendants in January 1962; defense counsel contended it was not feasible to carry on the negotiations and to prepare for the criminal matter at the same time. In February 1962 an informal application for adjournment of the criminal trial, then set for April 2, 1962, was opposed by the trial attorney of the Department of Justice, who announced his readiness to proceed notwithstanding the negotiations in the civil suit; however, several days later, when the first formal motion for an adjournment was made, based on affidavits, he did not oppose and the trial date thereupon was set for June 4, 1962. The second motion for an adjournment was made on May 23, 1962 upon the ground that the parties were still engaged in their negotiations. The Court then marked the case off the calendar, noting that the trials of other assigned cases were being held up, and stated that no new trial date would be set unless it was represented that all parties were actually ready to proceed to trial. The Court had no word from either Government or defense counsel until the present application was made in January 1964. All the defendants acquiesced in the applications for adjournments made in 1962. Indeed, all were more than satisfied to have a continued deferment of the indictment charges while they attempted to negotiate a consent decree in the civil suit. It is clear that protracted negotiations were responsible for the delay.

■ With the passage of time the reevaluation was made in June 1963 by

---

16. Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

17. Id. at 363, 76 S.Ct. 406, 100 L.Ed. 397.

18. Id. at 364, 76 S.Ct. at 409, 100 L.Ed. 397.

19. Local Rule 2.

the trial attorney, more than four years after the return of the indictment. The fact that prior thereto the Government stated readiness to proceed in early 1962, when the defendants were not, affords no basis for rejecting the present motion grounded upon its reassessment of the situation.[20]

Other factors come into play. A trial of ten or more weeks involves a considerable expenditure of effort and money. Apart from the actual period of trial, months of intensive preparation and the exclusive services of a substantial staff of attorneys and others would be required. To be sure, the heavy cost of enforcement of law in terms of manpower and money is of no consequence when necessary to insure the integrity of our laws,[21] but needless expenditure of public funds is not justified. The responsibility for prosecution is upon those in charge of the matter. It is they who must carry on with the witnesses or evidence now available, and if in their considered judgment they are without means successfully to present an adequate case within the framework of the indictment, there is no warrant for continuing the prosecution unless it appears that the assigned reason for the proposed dismissal is not grounded in fact, and none appears. The Court is satisfied that the application is made in good faith and for the reasons stated. It would be an exercise in futility to require the prosecution to go forward with a case in which it has no faith.

Finally, another factor cannot be ignored. Should the motion be denied, what next? The Attorney General is the head of the Department of Justice, a part of the Executive branch of the Government.[22] Even were leave of Court to the dismissal of the indictment denied, the Attorney General would still have the right to adhere to the Department's view that the indictment cannot be supported by proof upon a trial of the merits, and accordingly, in the exercise of his discretion, decline to move the case for trial. The Court in that circumstance would be without power to issue a mandamus or other order to compel prosecution of the indictment, since such a direction would invade the traditional separation of powers doctrine.[23] And if

20. Slate Belt's suggestion that as late as December 26, 1963 the Government planned to try the criminal case is not borne out by the conversation relied upon. The matter must be put in its proper frame of reference. The Government faced dismissal of its civil suit for want of prosecution under an order of the Review Calendar Judge that it file a note of issue by a certain date. This it failed to do; moreover, the Government had not initiated any pretrial procedures, apparently because of the continued negotiations with respect to a consent decree. Accordingly, in order to avoid dismissal for noncompliance with the Court's order, the Government moved for an extension of time to file the note of issue. On December 20, 1963, in the absence of opposition by any defendant, the Government's motion was granted and the time to file the note of issue was extended to January 13, 1964. The conversation now relied upon to support the claim that the Government was in a position to try the criminal case related to the foregoing order in the civil case and was initiated by an inquiry as to whether the Government intended to complete its pretrial procedures therein by January 13, 1964. It is clear that the Department then was at the point of final decision with respect to the criminal prosecution, and until the actual determination to move for dismissal of the indictment it was under no obligation to inform the defendants in advance that such a motion was under consideration.

21. Cf. United States v. Standard Ultramarine and Color Co., 137 F.Supp. 167 (S.D.N.Y.1955).

22. Rev.Stat. § 346 (1875), 5 U.S.C. § 291 (1958).

23. "By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority and in conformity with his orders.

"In such cases, their acts are his acts; and whatever opinion may be entertained

the indictment continues to remain in status quo, each defendant would be in a position to move for dismissal of the indictment under Rule 48(b).[24] While this does not nullify the responsibility of the Court where its sanction is being sought, it is a factor to be taken into account.

■ The underlying reasons for Slate Belt's opposition have already been noted. Thus it is understandable that its membership, having enjoyed, according to its business manager, unparalleled prosperity and a greater flow of business "at the expense of Greater's contractors in New York City," which it attributes to the pending indictment, it should seek to keep the indictment alive as a sort of *in terrorem* force for Slate Belt's continued benefit; however, its motivation is its economic self interest and welfare. The purpose of an indictment is not to aid the private interests of a party engaged in controversy with others, although, to be sure, at times an indictment, prosecution and conviction may achieve that incidental result. The plain fact is that during the five-year period since the return of the indictment, neither Slate Belt nor any other defendant has sought a trial of the criminal charges. Slate Belt had a constitutional

right to press for a speedy trial or to move for dismissal of the indictment.[25] It did neither; nor did any other defendant. The parties concentrated their efforts on negotiations for a consent decree in the civil suit, which appear to have aborted. The record leaves no room to doubt that had an accord been reached on a proposed decree, the defendants contemplated, whether they openly expressed it or not, the avoidance of the criminal trial.[26] The inordinate delay resulting from the actions of the parties has contributed to the present situation. Slate Belt, as much as any other defendant, bears some measure of responsibility that the criminal case did not go forward when the Government was ready. Under the facts here presented, it is not entitled to keep the indictment alive to meet its personal interests, which appear to clash with those of other codefendants.

It must be assumed that should any violation of law occur, appropriate action will be taken by enforcement officials to protect and vindicate the public interest.

The Court, in the exercise of discretion, grants the application.

---

of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion." Marbury v. Madison, 5 U.S. (1 Cranch.) 137, 165–166, 2 L.Ed. 60 (1803). Cf. Parker v. Kennedy, 212 F. Supp. 595 (S.D.N.Y.1963).

24. "* * * [I]f there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint."

25. See Fed.R.Crim.P. 48(b).

26. When, in February 1962, on the first application for adjournment, reference was made to a possible disposition of the criminal matter by a defense attorney, this Court stated:

"* * * [U]p to now I never have participated in any discussion, either with defendants, their counsel or Government counsel, as to the disposition to be made of a criminal case. This is a matter that rests entirely between the government and the defense. I have observed this rule up to now and I am not going to change my position about it. There may be compelling reasons why the government ought not to go ahead or ought to go ahead in the criminal case. This is a matter for a judgment and decision on the part of the Attorney General and the Department of Justice.

"So far as this Court is concerned, it is ready to try this case * * * whenever the parties are ready * * *." S.M. 31, February 6, 1962.